**In re TI.B., Ty.B.**

**T.B., Sr., Appellant.**

**Nos. 00–FS–918, 00–FS–919.**

District of Columbia Court of Appeals.

Argued Sept. 28, 2000.
Decided Nov. 3, 2000.

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein, Public Defender Service, and Geoffrey Harris were on the brief, for appellant, T.B., Sr.

Carl J. Schifferle, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Lutz Alexander Prager, Assistant Deputy Corporation Counsel, were on the brief, for appellee, District of Columbia.

Lawrence M. Spillan, Washington, DC, as guardian ad litem, filed a statement in lieu of brief, for appellees Ti.B. and Ty.B.

Before FARRELL and GLICKMAN, Associate Judges, and MACK, Senior Judge.

GLICKMAN, Associate Judge:

This is a mid-trial appeal in a neglect proceeding. The principal question is whether the trial court abused its discretion in prohibiting appellant T.B. from conferring with his criminal defense counsel about his privilege against self-incrimination, and in barring that counsel from the courtroom while T.B. asserted that privilege. We conclude that the trial court erred. Its rulings, which were not justified by any substantial threat to the integrity or confidentiality of the proceeding, arbitrarily infringed T.B.'s common law and First Amendment right to consult freely with his lawyer, and deprived T.B. of informed legal advice about his Fifth Amendment privilege.

## FACTUAL BACKGROUND

The neglect petitions filed by the District of Columbia allege that appellant T.B. has a history of domestic violence and is the prime suspect in the disappearance, and suspected murder, of Y.B., the mother of T.B.'s minor children. Those children, appellees Ti.B. and Ty.B., were removed from T.B.'s care and placed with relatives pending the outcome of the neglect proceeding. T.B., who has not formally been charged with any crime, is contesting the government's allegations and is seeking his children's return.

After the neglect petitions were filed, a hearing commissioner ordered T.B. to undergo a mental evaluation "to explore [his] history of domestic violence, unresolved

issues of anger," and other issues. On the recommendation of his court-appointed neglect counsel, T.B. consulted the District of Columbia Public Defender Service (PDS) for advice regarding his Fifth Amendment privilege against self-incrimination. Following that consultation, PDS attorney Jonathan A. Rapping undertook to represent T.B. with respect to criminal law matters. Mr. Rapping inquired with the United States Attorney's Office and learned that T.B. was the target of a grand jury investigation into the disappearance of Y.B. The same information was furnished to T.B.'s neglect counsel by the Assistant Corporation Counsel handling the neglect matters.

In view of this information and T.B.'s privilege against self-incrimination, neglect counsel moved to modify the mental evaluation order so as to preclude questioning about domestic violence and T.B.'s relationship with Y.B. As this motion was still pending on the scheduled evaluation date, Mr. Rapping accompanied T.B. to the evaluation and advised the psychologist that T.B. would decline to answer questions that might tend to incriminate him. So apprised, the psychologist chose not to interview T.B.

Mr. Rapping then filed a notice of entry of appearance in the neglect cases for the limited purpose of advising T.B. with respect to his rights and liabilities as the target of an ongoing criminal investigation. The notice stated that PDS was authorized to furnish such limited representation of T.B. in the neglect proceedings by D.C.Code § 1–2702(a)(2) (1999).[1] Four days after the notice was filed, however, the trial court *sua sponte* issued an order striking Mr. Rapping's entry of appearance and barring PDS from reviewing the neglect case files. Without mentioning the statutory provision on which Mr. Rapping relied, the order stated that "[t]he Court finds that PDS is not authorized to participate in these confidential proceedings."

In the wake of the trial court's order, T.B.'s neglect attorney moved to withdraw on the ground that she would be unable to represent him adequately at trial without Mr. Rapping's assistance as co-counsel. With the trial date almost upon him, T.B. obtained another attorney, Geoffrey Harris, to represent him in the neglect matters. Mr. Harris, who has criminal defense as well as neglect experience, appeared with T.B. on the day of trial and confirmed that he was ready to proceed. The court permitted T.B.'s appointed counsel to withdraw and allowed Mr. Harris to replace her.

Before trial commenced, the court orally admonished all counsel not to reveal any information obtained in the proceedings, warning that "the Court will deal harshly with anyone who violates" what it called the "veil of confidentiality."[2] Counsel for the District inquired whether Mr. Rapping would be allowed to attend the trial. The court ruled that Mr. Rapping "has no place in these proceedings" and would be barred from the courtroom.

On the second day of trial, the District called T.B. as a witness. Mr. Harris advised the court that T.B. would invoke his Fifth Amendment privilege not to testify because he was under investigation for

---

1. According to the notice, Mr. Rapping's entry of his appearance was proper because: [T]he statute which authorizes PDS representation, makes clear that "[r]epresentation may be furnished at any stage of a proceeding, including appellate, ancillary, and collateral proceedings." D.C.Code § 1–2702(a)(2). Furthermore, the statute provides that "[t]he Service shall determine the best practicable allocation of its staff personnel to the courts where it furnishes representation." *Id.* PDS has determined

that we cannot represent [T.B.] adequately without appearing, for the limited purpose set forth above, in this ancillary matter.

2. Midway through the first day of trial, the court "reiterate[d] her admonition that these matters before the Court and the testimony that is being received at this time are confidential in nature [and that the] Court will deal harshly with individuals who violate the confidentiality of these proceedings."

criminal offenses in connection with the disappearance of Y.B. The court ruled that T.B. could not assert a blanket privilege and would have to invoke the Fifth Amendment on a question-by-question basis. Mr. Harris then asked the court to permit T.B.'s criminal defense counsel, Mr. Rapping, to be present "to advise [T.B.] as to what questions could call for incriminating answers." Mr. Harris explained that he did not know "the contours of the criminal case" and that T.B.'s criminal lawyer would better recognize which questions would pose a threat of self-incrimination.

In response to this request, the trial court stated that it "[did] not believe that it's necessary to have the criminal attorney present" because it deemed Mr. Harris to be "competent legal counsel." Unpersuaded by Mr. Harris's protestation that he did not know enough about T.B.'s criminal exposure to be comfortable advising him question-by-question about his Fifth Amendment privilege, the court ruled that Mr. Rapping would not be allowed in the courtroom.

T.B. then took the witness stand and was examined by the District's counsel. On advice of Mr. Harris, T.B. asserted a Fifth Amendment privilege not to answer some (though not all) of the questions he was asked. The court overruled T.B.'s invocation of the privilege in one instance and required him to answer whether he and Y.B. had an arrangement regarding the financial support of their children.

T.B. was still on the witness stand being examined by the District when trial adjourned for the day. The court instructed T.B. that he was not to discuss his testimony "with anyone" during the break, and reminded all present that they were not allowed to share information obtained during the trial with anyone else. Mr. Harris asked for leave to advise Mr. Rapping that T.B. was on the witness stand and asserting a Fifth Amendment privilege. The court denied this request and ordered Mr. Harris "not to tell" Mr. Rapping that his client was testifying. Mr. Harris asked if

T.B. himself would be allowed to speak with his criminal defense counsel in order to obtain informed advice about invoking his privilege against self-incrimination. The court rebuffed this request as well.

During the ensuing recess in the trial, T.B. moved the court to vacate its rulings barring him and Mr. Harris from consulting with Mr. Rapping about the neglect proceedings, and barring Mr. Rapping from the courtroom. In the alternative, T.B. asked the court to stay the proceedings pending appellate review. When no ruling on his motion was forthcoming, and while the trial was still in recess, T.B. filed the instant interlocutory appeal along with a petition for a writ of mandamus. This court stayed the neglect proceedings and expedited the appeal, but allowed the trial court to rule on T.B.'s motion.

The trial court thereupon denied the motion in a written opinion. The court stated that it had "admonished all parties and counsel that neglect proceedings are confidential and are not [to] be discussed with anyone who is not a party to the case"; "admonished the attorneys and parties not to disclose information from the neglect proceedings"; and ruled that "Mr. Rapping is not permitted in the courtroom during the neglect trial." The court adhered to these rulings because, it said, the goals of maintaining the integrity and confidentiality of the neglect proceeding outweighed T.B.'s interest in providing his criminal defense attorney with information and access. The court did not identify any particular harm that would likely result from Mr. Rapping's participation. The court feared, however, "that it would be opening the floodgates to access [to] clearly confidential family information if it were to grant [T.B.'s] request. For instance, tax attorneys, divorce attorneys and other nonparties will seek intervention in these very personal matters." The court concluded that D.C.Code § 1–2702 did not entitle PDS attorneys to represent parents in neglect proceedings, and that T.B.'s right to legal assistance was

adequately protected because he had other competent counsel, Mr. Harris, to represent him. The court further concluded that its bar order did not violate T.B.'s "right to speak" because the court "did not single out [T.B.] in ordering that all parties and counsel not discuss the neglect proceedings with nonparties," and because it "tailored the prohibition specifically to the neglect trial in accordance with the overriding need to preserve the confidentiality of the proceedings."

## DISCUSSION

The issue that T.B. asks this court to address in this interlocutory appeal is a narrow one. T.B. does not challenge the trial court's ruling striking Mr. Rapping's appearance as his counsel in the neglect proceeding. We are not called upon, therefore, to decide whether PDS is authorized to represent T.B. in a neglect proceeding pursuant to D.C.Code § 1–2702 or otherwise, and we express no opinion on that question. In addition, T.B. does not challenge in its entirety the trial court's "gag" order prohibiting the parties and their counsel from disclosing anything about the neglect proceedings to anyone not involved in those proceedings (on pain of being dealt with "harshly"), with no exceptions and no temporal or other limitations or qualifications.[3] We likewise are not called upon to consider whether, or to what extent, attorneys with all sorts of relational interests to parties in a neglect case—e.g., "tax attorneys, divorce attorneys"—must be allowed to intervene or obtain information. In short, the instant appeal does not call upon us to evaluate all aspects of what may fairly be termed a sweeping prior restraint on speech.

At this time, T.B. asks us to vacate only the particular rulings of the trial court forbidding him and Mr. Harris from communicating with Mr. Rapping about the neglect proceeding, and barring Mr. Rapping from the courtroom during that proceeding. T.B. contends, first, that the court's rulings arbitrarily deprive him of the ability to make an informed decision about whether and when to invoke his Fifth Amendment privilege, and that this has serious ramifications not only for his neglect trial but also for the pending criminal investigation; and second, that the rulings infringe his First Amendment right to engage and consult a lawyer for the purpose of securing legal advice.

### Appellate Jurisdiction.

Before we address the merits of T.B.'s claims, we must decide whether we have jurisdiction to consider them. Under the collateral order doctrine, interlocutory orders are appealable if they (1) conclusively determine a disputed question of law; (2) resolve an important issue separate from the merits of the case; and (3) are effectively unreviewable on appeal from a final judgment. *See In re Estate of Chuong*, 623 A.2d 1154, 1157 (D.C.1993) (en banc). To put it succinctly, "interlocutory orders are appealable if they have a final and irreparable effect on important rights of the parties." *Meyers v. United States*, 730 A.2d 155, 157 (D.C.1999).

Applying these tests, courts have consistently permitted "gag orders" and orders restricting access to judicial proceedings to be appealed under the collateral order doctrine by non-parties—typically members of the press or other media—and

---

**3.** Similarly, T.B. does not specifically challenge the trial court's order that he not discuss his own testimony "with anyone," which arguably includes even his trial counsel Mr. Harris, until his examination is over. *But see Thompson v. Atlantic Bldg. Corp.*, 107 A.2d 784, 785 (D.C.1954) (reversing judgment in civil case because trial court impermissibly ordered appellant not to discuss case with his counsel during recess in his direct examina-

tion); *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1117–19 (5th Cir.1980) (same). *See also Jackson v. United States*, 420 A.2d 1202, 1204–05 (D.C.1979) (en banc) (no meaningful distinction between an order which prohibits witness from discussing the case generally with his lawyer and an order which by its terms only prohibits witness from discussing his testimony).

by trial participants as well. An example is *In re Rafferty*, 274 U.S.App.D.C. 348, 350–52, 864 F.2d 151, 153–55 (1988), a civil case involving a challenge to an order which barred disclosure of certain information to non-parties such as the Department of Justice. In permitting a party to the litigation to appeal under the collateral order doctrine, the court observed that "[i]t would certainly be anomalous if a litigant in Mr. Rafferty's shoes who wished to distribute information to the government or to the media could not appeal an order forbidding him from doing so, while the newspaper to whom he wished to give his story were able to appeal." *Id.*, 274 U.S.App.D.C. at 351, 864 F.2d at 154. *See also United States v. Brown*, 218 F.3d 415, 420–22 (5th Cir.2000) (permitting defendant in criminal case to appeal gag order prohibiting discussion of case with media, and collecting cases). Although the present case does not involve media or government access, the principles are the same, and we conclude that the trial court's orders prohibiting communications with Mr. Rapping and barring him from the courtroom meet the requirements of the collateral order doctrine and are immediately appealable.

First, the orders conclusively determine disputed questions of law. That is undisputed. Second, whether T.B. has the right to share information and access with his criminal defense attorney is, as we explain below, an important issue with constitutional dimensions; and as framed in this case, it is an issue that is separate from the merits of the neglect proceeding, which focus on whether T.B. is a fit parent, whether his children have been neglected, and, ultimately, what disposition would be in their best interest.

Third, we are satisfied that the orders are not effectively reviewable on appeal from a final judgment. By restricting Mr. Rapping's access to relevant information generated in the neglect hearing, and preventing him from advising T.B. on his Fifth Amendment privilege, the orders deprive T.B. of Mr. Rapping's full and timely legal assistance not merely with respect to the neglect proceeding, but with respect to the pending criminal investigation (and any future criminal prosecution) as well. The deprivation is immediate, and it continues so long as the orders remain in force. T.B.'s defense to the criminal investigation may be compromised if he erroneously waives his Fifth Amendment privilege,[4] or if he cannot communicate ex-

---

**4.** The District argues that T.B.'s testimony in the neglect proceeding could not be used against him by the United States Attorney in a criminal prosecution, because D.C.Code § 16–2331 (1997) provides that transcripts of the proceeding (and other "juvenile case records") shall be kept confidential and not divulged to unauthorized persons or used for unauthorized purposes.

Section 16–2331 does not eliminate T.B.'s concerns. In the first place, the statute permits inspection of records by "persons having a professional interest in ... the work of the Superior Court ...." § 16–2331(b)(7). In *Frye v. United States*, 600 A.2d 808 (D.C. 1991), this court thought it "at least arguable that a defense attorney is sufficiently interested in the 'work of the Superior Court,' as it pertains to his or her client, to fall within this provision," *id.* at 812, and the same might be said of a prosecutor. Superior Court Neglect Rule 31, which implements § 16–2331, allows "[a]ny person or agency" not named in the statute to apply for a special order to inspect

and copy juvenile case records based on a showing, *inter alia*, of "[t]he potential importance to the justice system" of the proposed disclosure. *Cf. District of Columbia v. Cooper*, 483 A.2d 317, 322–23 (D.C.1984) (in the interests of fairness, confidentiality statute does not bar District from introducing plaintiff's juvenile records in a civil case to rebut claim of psychological injuries); *see also Devore v. United States*, 530 A.2d 1173, 1175 (D.C.1987) (recognizing that confidentiality of juvenile records "is not absolute" and must yield in some cases). The question of prosecutorial access remains an open one, as is the question whether a federal grand jury subpoena for records can override the statutory confidentiality requirements.

We also note that the statutory prohibition on disclosure of records does not in terms prevent participants in the neglect proceeding from reporting what T.B. testified based on their memories or their own notes of the proceeding. Nor does the statute guarantee that T.B.'s transcribed testimony could not be

culpatory or otherwise helpful information acquired in the neglect proceeding to Mr. Rapping.[5] That potential harm is incapable of being either evaluated or remedied on appeal from a final judgment in this case. Even if, in an eventual appeal, this court vacated the trial court's orders and reversed a final adjudication of neglect, we could not be confident that such deferred relief would undo the harm inflicted in the interim on T.B.'s representation with respect to the criminal investigation.

For these reasons, we reject the District's analogy of the orders in this case to orders disqualifying counsel, which normally are not appealable under the collateral order doctrine. *See Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 439–40, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985); *Estate of Chuong,* 623 A.2d at 1158. Attorney disqualification orders are usually not separate from the merits of the trial because the grounds for disqualification, such as conflict of interest or attorney misconduct, are usually intertwined with the dispute that is the subject of the trial; and because "[o]nly after assessing the effect of the ruling on the final judgment could an appellate court decide whether the client's rights ha[ve] been prejudiced." *Richardson–Merrell,* 472 U.S. at 439, 105 S.Ct. 2757. In addition, disqualification orders are usually subject to effective review on appeal from a final judgment because the harm from a disqualification ruling is usually sustained in the case at hand, and is amenable to remedy by means of a reversal and a new trial. These reasons why disqualification orders are not appealable under the collateral order doc-

trine do not apply to the trial court's orders in this case.

Finding our jurisdiction intact, we address the lawfulness of those orders.[6]

*Lawfulness of the Trial Court's Orders*

T.B. contends that in violation of due process, the trial court's orders arbitrarily impaired his ability to make an informed invocation of his Fifth Amendment privilege by preventing his attorney who was most knowledgeable about his exposure to criminal prosecution from advising him. More broadly, T.B. further contends that the court's orders violated the First Amendment by restricting his freedom to consult with the attorney of his choice. In response, the District, echoing the trial court's rationale, defends the orders as a legitimate exercise of judicial discretion for the purpose of protecting the confidentiality and integrity of the neglect proceeding. On the record before us, however, we are compelled to hold that the trial court exceeded its authority and lacked adequate justification for interfering as it did with T.B.'s attorney-client relationship with Mr. Rapping. In restricting T.B.'s communications with his attorney and barring that attorney from the courtroom, the trial court abused its discretion, and we must vacate its orders.

 To begin with, it is embedded in our common law that a trial court may not impose arbitrary or unjustified restrictions on speech between attorneys and their clients. "Through the attorney-client privilege, the common law 'encourage[s] full and frank discussions between attorneys

---

used against him indirectly (if perhaps inadvertently), especially since the statute permits inspection of juvenile case records by the Corporation Counsel, the respondent, his parents or guardians, their duly authorized attorneys, and others. *See* § 16–2331(b).

5. This court has held that a criminal defendant has a due process right under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to obtain and make appropriate use of exculpatory evidence in otherwise confidential juvenile case records. *See*

*Smith v. United States,* 665 A.2d 962, 968–69 (D.C.1995).

6. Inasmuch as we have jurisdiction to hear T.B.'s interlocutory appeal under the collateral order doctrine, we have today denied by separate order T.B.'s petition for a writ of mandamus. *See Banov v. Kennedy,* 694 A.2d 850, 857 (D.C.1997) (mandamus inappropriate if party seeking the writ has other adequate means to obtain relief); *Stebbins v. Stebbins,* 673 A.2d 184, 192 (D.C.1996) (same).

and their clients and thereby promote[s] broader public interests in the observance of law and the administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends on the lawyer being fully informed by the client.'" *Martin v. Lauer*, 222 U.S.App. D.C. 302, 310, 686 F.2d 24, 32 (1982) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). The United States Court of Appeals for the District of Columbia Circuit elaborated on these considerations in *Doe v. District of Columbia*, 225 U.S.App.D.C. 225, 697 F.2d 1115 (1983), in remarks we find apropos here:

> In order to decide the case before us, we need not elevate to constitutional status the right to the aid of counsel. It is sufficient for present purposes to recognize simply that every litigant has a powerful interest in being able to retain and consult freely with an attorney. Insofar as the fair administration of justice requires that all parties to a controversy be fully and equally informed of their entitlements, the public has a similarly important interest in preserving the ability of each disputant to confer with his lawyer. This public interest is reinforced by the value we place on the right of every litigant to participate in the process whereby justice is done-to understand and become involved in the proceeding, not to be compelled passively to await its outcome. Regardless of whether these considerations are deemed to be inherent in the principle of due process, they must be accorded considerable weight by a trial judge when

considering the propriety of issuing a protective order. . . .

*Id.*, 225 U.S.App.D.C. at 229–30, 697 F.2d at 1119–20 (citation omitted). Thus, setting aside situations involving conflict of interest or other impropriety, it is simply " 'not the function of the trial judge to decide ... how much consultation' " is appropriate between lawyer and litigant. *Jackson*, 420 A.2d at 1205 (citation omitted). Where a litigant has more than one lawyer, as here, it is likewise not the function of the trial court to decide which lawyer's advice the litigant shall receive. *Cf. People v. Knowles*, 88 N.Y.2d 763, 650 N.Y.S.2d 617, 673 N.E.2d 902 (1996).[7]

■ These principles are not only ingrained in our common law, they are also rooted in the Constitution. Although judicial orders barring litigants from communicating with their attorneys about their legal rights and responsibilities are rare, it is settled that "the First Amendment protects the right of an individual or group to consult with an attorney on any legal matter." *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir.2000). Ordinarily, therefore, under the First Amendment "the state cannot impede an individual's ability to consult with counsel on legal matters." *Id.; see also DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir.1990) ("The right to retain and consult with an attorney ... implicates not only the Sixth Amendment[8] but also clearly established First Amendment rights of association and free speech."). Similarly, in *Martin*, the District of Columbia Circuit held that under the First Amendment, "private parties have an undeniable right to retain counsel to ascertain their legal rights," and that "the right

---

7. In *Knowles*, the New York Court of Appeals reversed a criminal conviction because the trial court arbitrarily barred a second Legal Aid attorney from sitting with the defendant at counsel table and assisting in his defense. The court held that "in exercising its discretion to manage the courtroom, the court's interference with the defendant's established relationship with counsel must be justified by overriding concerns of fairness or efficiency— regardless of whether counsel is assigned or

retained and regardless of whether defendant is represented by more than one attorney." *Id.* at 906.

8. Because T.B. is still only a suspect in a criminal investigation, the Sixth Amendment right to counsel does not come into play. *See United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984).

to confer with counsel would be hollow if those consulting counsel could not speak freely about their legal problems." *Id.,* 222 U.S.App.D.C. at 310, 686 F.2d at 32.

Arbitrary or unjustified interference with a litigant's consultation with counsel may also rise to the level of a due process violation if it impairs the litigant's right to a fair hearing. In *Potashnick, supra,* the Fifth Circuit reasoned that the right to consult with counsel in civil litigation is a corollary of the due process right to a hearing. *Id.,* 609 F.2d at 1117–18 (citing, *inter alia, Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). The District of Columbia Circuit has also recognized that "impairment of communications between attorneys and their clients may be unconstitutional as a denial of the right of access to the courts." *Martin,* 222 U.S.App.D.C. at 310 n. 36, 686 F.2d at 32 n. 36. The rationale is straightforward. "In many situations, the right to a hearing would be meaningless were the litigant forbidden to obtain the assistance of a lawyer in determining the nature of the claims against him, the opposing arguments available to him, and the manner in which his case would be most effectively presented." *Doe,* 225 U.S.App.D.C. at 229, 697 F.2d at 1119; *see also Potashnick,* 609 F.2d at 1118.

In this case there is no suggestion of conflict of interest or other impropriety. On their face, therefore, the orders of the trial court conflict with firmly established common law and constitutional norms protecting speech between attorneys and their clients.

In addition, we find that the record supports T.B.'s claim that the orders did in fact impair his ability to obtain informed legal advice on his Fifth Amendment privilege against self-incrimination in the neglect proceeding. Although the court deemed Mr. Harris able to render competent advice, Mr. Harris explained that he was not knowledgeable about the criminal investigation and that he might fail to appreciate the incriminating potential of questions posed to T.B. by counsel for the District. Mr. Harris maintained that Mr. Rapping, as the attorney representing T.B. vis-à-vis the criminal investigation, was better equipped to render informed advice about whether and how T.B.'s answers to questions would furnish a "link in the chain of evidence" necessary to convict him of a crime. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). These representations were unrebutted and perfectly plausible. Assertion of the privilege against self-incrimination "often depends upon legal advice from someone who is trained and skilled in the subject matter." *Maness v. Meyers,* 419 U.S. 449, 466, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). "The decision to invoke or waive the Fifth Amendment is not always self-evident, and it requires serious consideration of the consequences. Counseling by a lawyer familiar with the ramifications of a particular case and the intricacies of the law in this area is highly desirable...." *S.E.C. v. Graystone Nash, Inc.,* 25 F.3d 187, 192 (3d Cir.1994). We cannot be confident that T.B. has thus far received fully informed advice and assistance, or that he will receive such advice and assistance without Mr. Rapping when his examination resumes.

To justify an order curtailing presumptively protected communication between a litigant and his attorney, "the court must be confident that the potential injury [from disclosure of information] is substantial and cannot be prevented through the use of any device less restrictive of a party's access to his lawyer." *Doe,* 225 U.S.App.D.C. at 230, 697 F.2d at 1120. The Supreme Court has "counsel[ed] caution on the part of a district court in drafting such an order, and attention to whether the restraint is justified by a likelihood of serious abuses." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 104, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). The court must weigh the need for restrictions

against the rights of the parties in order to produce "a carefully drawn order that limits speech as little as possible." *Id.* at 102, 101 S.Ct. 2193.

The trial court's orders in this case that "neglect proceedings are ... not to be discussed with anyone who is not a party to the case"; and that the parties were "not to disclose information from the neglect proceedings," were not "carefully drawn" and did not limit speech "as little as possible." While those broad prohibitions against any discussion of the neglect proceedings with anyone not a party are subject to criticism in more than one respect, the fatal flaw is the absence in the record of any substantial justification for them. Simply put, neither the trial court nor the District have articulated, and the record does not reveal, any risk of identifiable harm that would support the rulings prohibiting communication with Mr. Rapping about the neglect proceeding and excluding him from that proceeding.

■ The trial court explained that its rulings were necessary to protect the integrity and the confidentiality of the neglect trial. Those goals are laudable, but Mr. Rapping's proposed involvement did not jeopardize them. As to the integrity of the proceeding, the trial court was apparently concerned with the conduct and management of the trial. We agree, however, with the New York Court of Appeals that "judicial interference with an established attorney-client relationship in the name of trial management may be tolerable only where the court first determines that counsel's participation presents a conflict of interest or where defense tactics may compromise the orderly management of the trial or the fair administration of justice." *Knowles,* 650 N.Y.S.2d 617, 673 N.E.2d at 904. Nothing in the trial court's opinion in this case or the record as a whole suggests that Mr. Rapping's presence in the courtroom or his communications with T.B. and Mr. Harris would delay or disrupt the trial in any way. On appeal the District offers "the likelihood

that the neglect proceedings could turn into a discovery proceeding for the related criminal prosecution-instead of focusing on the welfare of the children." The District also posits "the potential chilling effect on the fact-finding process that would result if [the court] opened the proceedings to other, unnecessary persons." These possibilities, advanced for the first time on appeal, are not borne out by anything in the record. There was, for example, no indication (let alone evidence) that Mr. Rapping would seek to redirect questioning of witnesses to matters not germane to the proceeding, or that his presence would somehow intimidate witnesses. If such eventualities arose, the trial judge has sufficient control over her courtroom proceedings to deal with them appropriately and efficiently.

Moreover, while the concept of "integrity of the proceeding" encompasses a concern for efficiency and expedition, it is not limited to those goals. The integrity of the proceeding also depends crucially on respect for the rights of the participants. To ensure the integrity of the proceeding, it was the trial court's obligation to "make special efforts" if necessary to accommodate T.B.'s fully informed exercise of his Fifth Amendment privilege. *United States v. Certain Real Prop.,* 55 F.3d 78, 83 (2d Cir.1995). The court should therefore have been receptive to T.B.'s request to be allowed to confer with Mr. Rapping, not dismissive of that request.

■ We turn to what we perceive to be the trial court's principal justification for its orders, that the D.C.Code mandates the confidentiality of neglect proceedings. Tested against its statutory basis, however, this justification also falls short of the mark. The legislative policy of confidentiality serves important ends, which we do not hesitate to reaffirm. However, that policy is not absolute, and its statutory implementation is not unlimited. Nothing in the law governing neglect proceedings supports the broad rulings excluding Mr. Rapping from the courtroom and prohibit-

ing T.B. and Mr. Harris from conferring with Mr. Rapping about T.B.'s testimony and other developments in the hearing.

■ There are two pertinent statutory provisions bearing on confidentiality. One addresses the confidentiality of hearings, and the other the confidentiality of records. First, under D.C.Code § 16–2316(e) (1997), hearings in juvenile neglect, delinquency and need of supervision cases are closed to the general public. The statute also provides, however, that "persons necessary to the proceedings shall be admitted," and that the Family Division "may, pursuant to rule of the Superior Court, admit such other persons (including members of the press) as have a proper interest in the case or the work of the court on condition that they refrain from divulging information identifying the child or members of his family involved in the proceedings." § 16–2316(e). Rule 30 of the Superior Court Rules Governing Neglect Proceedings implements this statutory language by providing for the admission of persons having a proper interest in neglect hearings so long as they agree not to disclose the parties' identities. The "primary purpose" of § 16–2316(e) and Rule 30 is thus not to enshroud neglect proceedings in an impenetrable veil of secrecy, but rather to "preserve the anonymity of juvenile respondents [and, in a neglect proceeding, other members of the family] in order to foster an atmosphere conducive to rehabilitation." *In re J.D.C.*, 594 A.2d 70, 72 (D.C.1991).

Additionally, under D.C.Code § 16–2331 (1997), case records relating to neglect (and other juvenile) proceedings, such as petitions, transcripts and court orders, are also deemed confidential and not open to the general public.[9] Inspection of case records is permitted, however, to the parties, their "duly authorized attorneys," and other designated persons. § 16–2331(b). In addition, the statute states that "other persons having a professional interest in

the protection, welfare, treatment, and rehabilitation of the respondent or of a member of his family, or in the work of the Superior Court," may inspect case records "if authorized by rule or special order of the court." § 16–2331(b)(7). This provision is implemented by Rule 31 of the Superior Court Rules Governing Neglect Proceedings, which sets forth procedures in Rule 31(b) for any person to apply for a special order.

The orders in this case cannot be sustained as a proper exercise of the trial court's discretion under either § 16–2316(e) or § 16–2331. We consider first the order of exclusion. It is arguable that as T.B.'s criminal defense lawyer, Mr. Rapping was "necessary to the proceedings" within the meaning of § 16–2316(e), at least to the extent that T.B. needed to consult him about exercising his Fifth Amendment privilege. If so, Mr. Rapping had a statutory right to be admitted, and the exclusion order was improper for that reason. We need not reach that question, however. At a minimum, Mr. Rapping had "a proper interest in the case" within the meaning of the statute, since the criminal allegations against T.B. were the primary focus of the neglect hearing and T.B. found it necessary to invoke his privilege against self-incrimination while testifying in that hearing. Mr. Rapping's interest in the case was "proper" because it was reasonably related to his duty to defend T.B. It did not stem from idle curiosity or a wrongful motive. In addition, as a member of the District of Columbia Bar, Mr. Rapping was "deemed" by Superior Court Rule to have "a proper interest in ... the work of the court." *See* Super. Ct. Neg. R. 30(b). Under the statute, persons with a proper interest in either the particular case or the work of the court are qualified to be admitted; indeed Rule 30(b) specifically provides that D.C. Bar members need not even make formal application in

---

9. "Juvenile social records," such as predisposition studies, and law enforcement records

concerning juveniles are similarly confidential. *See* D.C.Code §§ 16–2332 through 2334.

order to be admitted to neglect hearings and other Family Division hearings.

■▇▇▇▇ The use of the word "may" in § 16–2316(e) means that the trial court does retain discretion to exclude persons even if they have a proper interest. *See In re J.D.C.,* 594 A.2d at 75. But that judicial discretion is not to be exercised arbitrarily. If a discretionary decision of the trial court "is supported by improper reasons, reasons that are not founded in the record, or reasons which contravene the policies meant to guide the trial court's discretion or the purposes for which the determination was committed to the trial court's discretion, reversal likely is called for." *Johnson v. United States,* 398 A.2d 354, 367 (D.C.1979). Furthermore, if a trial court has discretion but fails to exercise it, "preferring instead to adhere to a uniform policy, it also errs ." *Id.* at 363. "Failure to exercise choice in a situation calling for choice is an abuse of discretion—whether the cause is ignorance of the right to exercise choice or mere intransigence—because it assumes the existence of a rule that admits of but one answer to the question presented." *Id.*

Thus the question under § 16–2316(e) is whether the court had sufficient reason, rooted in the record, to support a discretionary decision to exclude Mr. Rapping from the neglect proceeding in order to preserve the confidentiality required by law. The mere fact that Mr. Rapping himself would acquire otherwise confidential information by attending the hearing was not a sufficient basis to exclude him. If it were, then anyone not absolutely necessary could be excluded from a neglect hearing for just that reason, which would be contrary to the design of the statute and the implementing Rule. Rather, the question is whether the trial court had reason to believe that Mr. Rapping would disobey the statutory requirement that he "refrain from divulging information identifying the child or members of his family involved in the proceedings," § 16–2316(e); or that Mr. Rapping would otherwise misuse the confidential information that he would acquire to the detriment of the parties.

There is no presumption that Mr. Rapping's duty to defend T.B. from criminal charges would likely cause him to violate his statutory duty of nondisclosure. On the contrary, the presumption that Mr. Rapping would maintain the anonymity of the parties is embodied in Rule 30(b), and is buttressed by Mr. Rapping's ethical obligation to preserve the confidences and secrets of his client. *See* D.C. Rule of Professional Conduct 1.6.[10] To rebut that presumption there must be evidentiary support in the record.

On our review of the record, we perceive no reason to conclude that Mr. Rapping would breach the statutory policy of confidentiality. In refusing to admit Mr. Rapping, the trial court articulated no such reason. The court made no inquiry even to determine whether Mr. Rapping would adhere to the requirements of confidentiality. *Cf.* Super. Ct. Neg. R. 30(d) (requiring certain persons seeking admission to neglect hearings to certify that they "will not divulge information identifying the child, members of the child's family, or any other party to the proceeding"). It appears from the categorical nature of the court's rulings that in excluding Mr. Rapping, the court merely followed an unwavering policy of its own to refuse admittance to anyone it did not consider absolutely necessary to the proceeding. Whether or not that is so, the court abused its discretion by excluding Mr. Rapping arbitrarily, i.e., without adequate reason, supported by the record, to believe that his presence would contravene statutory requirements.

---

**10.** Rule 1.6(b) states that " '[c]onfidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client."

This is not a case such as *In re J.D.C., supra,* where this court reversed an order admitting representatives of the press to a delinquency proceeding. We reversed that order because the record showed that one newspaper had already reported the name of the juvenile respondent, and readers could therefore link him to future articles about the case whether those articles identified him by name or not. We thus had ample record support for our admonition that "if there is no reasonable assurance that the admission of the press will be consistent with the protection of a juvenile respondent's anonymity, then exclusion may be the only alternative which will not compromise the legislature's paramount aim." *Id.,* 594 A.2d at 75.

If the order excluding Mr. Rapping from the neglect hearing was invalid, it follows a fortiori that the blanket order prohibiting T.B. from informing Mr. Rapping about that hearing cannot stand. In point of fact, neither § 16–2316(e) nor § 16–2331 (nor any other statute or rule that has been called to our attention) expressly imposes or authorizes a court to impose such an obligation of total silence on a party to a neglect proceeding. Section 16–2316(e) bars disclosure only of information identifying the parties to the proceeding, and that prohibition is applicable only to nonparties who are admitted because they have a proper interest in the case or the work of the court. Section 16–2331 bars disclosure only of case records and information obtained from those records; the statute does not prohibit neglect hearing participants from disclosing other information, such as, for example, what happens in the hearing in their presence.[11] Assuming, without deciding, that in appropriate circumstances the trial court has discretion to impose additional, non-statutory restrictions on the disclosure of information, the absence of any showing of substantial harm that would result from T.B.'s disclosure of information to Mr. Rapping is fatal to the restrictions imposed here. The presumption that a litigant is free to share whatever he wishes to share with his attorney is not defeated in this case.

We conclude that the trial court abused its discretion in excluding Mr. Rapping from the courtroom, and in prohibiting T.B. and Mr. Harris from conferring with Mr. Rapping about the neglect proceeding. We vacate those rulings and remand the case to the Superior Court for resumption of the hearing in accordance with this opinion.

*So ordered.*

11. This case does not involve a request for disclosure of case records. However, it is by no means clear that Mr. Rapping would necessarily be barred from inspecting such records in the instant matter. Mr. Rapping may well fall within the category of one of T.B.'s "duly authorized attorneys" entitled to inspect records by § 16–2331(b)(3), if he is so authorized by T.B. himself. (The term "duly authorized attorneys" is not defined in the statute.) Alternatively, he might be deemed a person "having a professional interest in the protection [and] welfare ... of a member of [the respondent's] family [i.e., T.B.], or in the work of the Superior Court" who could apply for a special order of court permitting inspection. § 16–2331(b)(7); *see also* Super. Ct. Neg. R. 31(b). Such an application would be committed to the trial court's sound discretion.