John DOE, et al.

v.

DISTRICT OF COLUMBIA, et al., Appellants.

No. 80–2171.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 23, 1981.

Decided Jan. 11, 1983.

As Amended Jan. 18, 1983.

As Amended on Denial of Rehearing March 7, 1983.

Separate statements of McKinnon and Edwards, Circuit Judges, and Robb, Senior Circuit Judge, see 701 F.2d 948.

Edward E. Schwab, Asst. Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel and Michael Zielinski, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellants. David P. Sutton, Asst. Corp. Counsel, Washington, D.C., also entered an appearance for appellants.

Peter J. Nickles, with whom Ellen Bass, Joseph M. Fisher and Charles E.M. Kolb, Washington, D.C., were on the brief, for appellees.

Before MacKINNON and EDWARDS, Circuit Judges, and ROBB, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Separate statements filed by MacKINNON and HARRY T. EDWARDS, Circuit Judges.

HARRY T. EDWARDS, Circuit Judge:

Appellees, inmates in the Lorton Maximum Security Facility ("Maximum"), brought this class action against the District of Columbia and several of its officials and employees, challenging the conditions of their confinement on a variety of constitutional, statutory and common law grounds. At trial, appellees presented evidence of their exposure to the danger of violent assault and sexual abuse—a situation allegedly caused or exacerbated by understaffing, deficient security equipment and procedures, inadequate systems for classifying and segregating prisoners, and a poorly designed and deteriorating physical plant. The case was submitted to a jury, which returned a verdict finding that the appellants had violated (a) the Eighth Amendment to the United States Constitution; (b) their duty of due care under the common law; and (c) their statutory duty to provide the inmates with "safekeeping, care, protection, [and] instruction."[1] The jury awarded to each member of the class of appellees damages in the amount of one dollar for each day of incarceration between July 4, 1976 and June 20, 1980. The trial judge supplemented that award with injunctive relief designed to ameliorate conditions in Maximum found to be violative of applicable common law, statutory and constitutional standards.

Appellants attack the verdict and the awards of relief on several grounds.[2] We find merit in four of the allegations of error. First, the issuance of a protective order sharply curtailing the ability of appellants' counsel to discuss with their clients information obtained during discovery constituted, we conclude, an abuse of discretion. Second, the failure to instruct the jury that appellants could not be held liable on a *respondeat superior* theory for constitutional torts committed by prison guards

---

1. The last of the three violations was predicated upon D.C.Code Ann. § 24–442 (1981). The trial judge inexplicably failed to charge the jury on two of the appellees' statutory causes of action. That omission has not, however, been challenged on appeal.

2. In addition to the defects discussed below, appellants assigned as error (i) the District Court's decision not to interpret D.C. CODE ANN. § 12–309 (1981) as restricting appellees' damage claims to the six-month period preceding the filing of the statutorily mandated notice, (ii) the Court's conclusion that appellees had presented sufficient proof of actual physical injury to make inappropriate a directed verdict for appellants on the local-law negligence claims, (iii) the Court's supposed failure to instruct the jury that to state a claim under the Eighth Amendment one need prove more than negligence, and (iv) the Court's refusal to allow the jury to consider the fact that the District of Columbia does not control its own budget and appropriations. All four arguments are without merit.

was error. Third, the instruction concerning the danger posed to weaker inmates by their proximity to a group of violence-prone prisoners was misleading. Fourth, the authorization to the jury to award appellees damages for the intrinsic value of their constitutional rights was inconsistent with controlling precedent.

## I. THE PROTECTIVE ORDER

In the course of trial preparation, appellees expressed reluctance to comply with appellants' discovery requests, fearing that the information they provided would somehow be transmitted to correctional officers inside Maximum and thence to other prisoners. The net result, they pointed out, would be to expose them to serious risk of violent reprisal. Appellants responded that they needed the information in question in order to prepare their defense. The trial judge attempted to devise a compromise solution to this dilemma. She granted appellants' motion to compel discovery. But, soon thereafter, she also granted appellees' motion for a protective order, pursuant to FED. R.CIV.P. 26(c), designed to prevent the facts revealed or allegations made in the course

of discovery from entering the prison "grapevine."

Our first task is to determine just how much the District Court restricted the ability of appellants' counsel to make use of the information they obtained. Unfortunately, the order was inartfully drafted. Viewed in isolation, it might be interpreted as prescribing only the situs of communications between appellants and their attorneys.[3] But such a reading would be inconsistent with the intent and understanding of the parties and, apparently, of the trial judge. Appellees certainly *sought* an order "prohibit[ing] defendants' counsel from in any way making known to the defendants information provided by plaintiff class members in depositions or other discovery proceedings."[4] Furthermore, the District Court explicitly stated that "plaintiffs' motion for protective order be and the same is hereby granted"[5] and gave no indication that the terms of the decree were any different from those requested; this strongly suggests that the order should be construed to comport with appellees' original plea. Any qualms we might have concerning such a construction are removed by the fact that

---

3. The full text of the order reads:

Upon consideration of plaintiffs' motion for protective order and defendants' response thereto, it is by the Court this 7th day of May 1980,

ORDERED that plaintiffs' motion for protective order be and the same is hereby granted, and that counsel for defendants are directed that all deposition materials, including the reporter's tapes and notes, any prepared transcripts, as well as any documents or other tangible items produced by plaintiffs and other class members be placed under seal and not be publicly used or otherwise published by counsel for the defendants, defendants, or any of their agents, employees, officers or servants outside the offices of the District of Columbia Corporation Counsel until all unresolved questions as to their production and ultimate use at trial be brought before this Court for final resolution at the time of the pretrial conference. This protective order shall apply to the following areas of inquiry: class members' possession of weapons and contraband; their knowledge of other persons' participation in assaults or similar incidents; other persons' possession of weapons or contraband; identities and other information concerning correctional of-

ficers who conduct improper searches or otherwise violate regulations or reasonable procedures designed for the security or safety of the residents. Furthermore, defendants are barred from using the testimony and documents obtained in any disciplinary, administrative, or other judicial proceeding involving any plaintiff or other class member.

Appendix ("App.") 84–85.

Appellees argue, with some force, that the ban on disclosures "by counsel for the defendants, defendants, or any of their agents" presumes rather than forbids communication between appellants and their lawyers and that the order merely requires that all conversations take place in "the offices of the District of Columbia Corporation Counsel." Nevertheless, given the undisputed facts of this case, *see* text at notes 4–5 *infra,* we are constrained to construe this language as intending to restrict further dissemination of any information already in the hands of defendants. Otherwise, we must conclude that the language simply reflects clumsy draftsmanship.

4. Motion for Protective Order, App. 75.

5. *See* note 3 *supra.*

the subsequent conduct of appellants, appellees and the trial judge makes plain that they all assumed that no discussion was permitted between appellants and their counsel concerning the fruits of discovery. The issue presented for review, therefore, is the validity, on the facts of this case, of a protective order forbidding not only all dissemination to the public but all disclosure by counsel to their clients of information of specified sorts obtained during discovery.

In general, district courts have broad authority, under FED.R.CIV.P. 26, to distinguish reasonable and productive uses of the discovery procedures from abusive invocations of those procedures and to design protective orders to curtail the latter. *See Keyes v. Lenoir Rhyne College,* 552 F.2d 579, 581 (4th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). Appellate courts will overturn such judgments only upon a clear showing of an abuse of discretion. *Galella v. Onassis,* 487 F.2d 986, 997 (2d Cir.1973).

Protective orders that restrict dissemination to the public of discovered information, however, stand on a somewhat unusual footing. The resultant infringement of interests protected by the First Amendment, we have held, requires a district court to be careful to grant such an order only when essential to shield a party from significant harm or to protect an important public interest. *In re Halkin,* 598 F.2d 176, 190–91 (D.C.Cir.1979). Moreover, the court must tailor the restraint so as to sweep no more broadly than necessary. *Id.* at 191.

District courts must be equally chary of issuing protective orders that restrict the ability of counsel and client to consult with one another during trial or during the preparation therefor. Such orders arguably trench upon constitutional interests at least as important as those infringed by restrictions on public dissemination of information. It is, of course, well established that due process requires "at a minimum . . . that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central*

*Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). In many situations, the right to a hearing would be meaningless were the litigant forbidden to obtain the assistance of a lawyer in determining the nature of the claims against him, the opposing arguments available to him, and the manner in which his case would be most effectively presented. *See* Note, *The Indigent's Right to Counsel In Civil Cases,* 76 YALE L.J. 545, 548–49 (1967). The foregoing considerations have prompted the Supreme Court to observe, in dictum:

> If in any case, *civil or criminal,* a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

*Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932) (emphasis added). Relying on similar arguments, some lower courts have expressly held that a civil litigant has a constitutional right to the assistance of hired counsel. *Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1117–18 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *Roberts v. Anderson,* 66 F.2d 874, 876 (10th Cir.1933); *Rex Investigative and Patrol Agency, Inc. v. Collura,* 329 F.Supp. 696, 699 (E.D.N.Y. 1971) (dicta).

In order to decide the case before us, we need not elevate to constitutional status the right to the aid of counsel. It is sufficient for present purposes to recognize simply that every litigant has a powerful interest in being able to retain and consult freely with an attorney. Insofar as the fair administration of justice requires that all parties to a controversy be fully and equally informed of their entitlements, the public has a similarly important interest in preserving the ability of each disputant to confer with his lawyer. This public interest is reinforced by the value we place on the right of every litigant to participate in the process whereby justice is done—to under-

stand and become involved in the proceeding, not to be compelled passively to await its outcome.[6] Regardless of whether these considerations are deemed to be inherent in the principle of due process, they must be accorded considerable weight by a trial judge when considering the propriety of issuing a protective order under FED.R. CIV.P. 26(c).[7]

We conclude, therefore, that the criteria set forth in our decision in *In re Halkin* as prerequisites for the issuance of an order restricting public dissemination of information obtained through discovery are equally applicable to the issuance of an order forbidding counsel to reveal such information to his client:

> The court must ... evaluate such a restriction on three criteria: the harm posed by [disclosure] must be substantial and serious; the restraining order must be narrowly drawn and precise; and there must be no alternative means of protecting the public interest which in-

trudes less directly on [attorney-client relations].

598 F.2d at 191 (footnotes omitted).

We do not intend these guidelines to be prohibitive in practice. Indeed, when serious harm to a party or to the community cannot be avoided without either forbidding discovery altogether or curtailing communication between one of the litigants and his attorney regarding discovered materials, the court should issue such a protective order.[8] But, to reiterate, the court must be confident that the potential injury is substantial and cannot be prevented through the use of any device less restrictive of a party's access to his lawyer.

Applying the foregoing standards to the instant case,[9] we are compelled to conclude that the District Court abused its discretion in issuing the protective order requested by appellees. The first of the three *Halkin* criteria does seem to have been satisfied. Affidavits submitted by appellees, detailing the danger of retaliation to which they would be exposed if persons

---

**6.** *See* Michelman, *Formal and Associational Aims in Procedural Due Process,* XVIII NOMOS 126 (1977); L. TRIBE, AMERICAN CONSTITUTIONAL LAW 502–03 (1978).

**7.** Our insistence that the trial judge recognize the importance of these factors is not undermined by the fact that his discretionary control over the discovery process includes the power to cut off inquiry altogether in order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED.R.CIV.P. 26(c). Merely because the government (here acting through the judiciary) may withhold a benefit or "privilege" entirely does not mean that it is free to condition the receipt of such an entitlement on the recipient's renunciation of a constitutional right. *See Sherbert v. Verner,* 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963) (state may not "condition the availability of [unemployment] benefits upon [the recipient's] willingness to violate a cardinal principle of his religious faith"); *Arnett v. Kennedy,* 416 U.S. 134, 211, 94 S.Ct. 1633, 1672, 40 L.Ed.2d 15 (1974) (Marshall, J., dissenting) (observing that "a majority of the Court rejects Mr. Justice Rehnquist's argument that because appellee's entitlement arose from statute, it could be conditioned on statutory limitation of procedural due process protections ...."); TRIBE, *supra* note 6, at 510. We believe that the force in the present context of the foregoing principle

would not be diminished even if a litigant's interest in consulting freely with his lawyer were not held to be constitutionally protected.

**8.** Such orders have frequently been issued, under FED.R.CIV.P. 26(c)(7), to prevent disclosure to a party's business competitor(s) of "trade secret[s] or other confidential research, development, or commercial information." *See, e.g., Chesa Int'l, Ltd. v. Fashion Assocs., Inc.,* 425 F.Supp. 234, 237 (S.D.N.Y.), *aff'd,* 573 F.2d 1288 (2d Cir.1977); *Maritime Cinema Serv. Corp. v. Movies en Route, Inc.,* 60 F.R.D. 587, 590 (S.D.N.Y.1973).

**9.** Our analysis of the application of the legal standards proceeds on the assumption that the only significant effect of the protective order was to forbid disclosure of the discovered information to appellants by their counsel. *See* text at notes 4–5 *supra.* Though the order by its terms also proscribed dissemination of the information to the public, *see* note 3 *supra,* appellants have not contended that they had any interest in publicizing the facts revealed and allegations made by appellees. Accordingly, the test set forth in *Halkin* controls this case because the order restricted attorney-client consultation, not because it intruded upon interests shielded by the First Amendment.

inside the prison learned of allegations they made in the course of discovery, were more than sufficient to show that "substantial and serious harm" might well have resulted from dissemination of the information in question.[10] The second requirement also seems to have been satisfied. The order was limited to designated "areas of inquiry;"[11] and information or charges of the specific sorts identified likely would have provoked retribution if communicated to the incriminated parties. The third criterion, however, was not satisfied. The District Court could have formulated a decree that would have been equally effectual in preventing retaliation and would not have inhibited consultation between appellants and their attorneys. The possibility that springs most readily to mind is a ban on communication (concerning matters learned through discovery) between the defendant prison officials and any of the prison guards or inmates. Under these circumstances, it was error to issue the order.

Appellants insist that, having found an abuse of discretion in the issuance of the protective order, we need not determine whether they suffered any demonstrable prejudice thereby. An infringement of the right to consult with one's attorney, they claim, is so serious as to be grounds for reversal even in the absence of a showing of harm. We need not address this argument because the injury to appellants in the instant case was palpable. They were prevented, not only from conferring with their lawyers regarding how best to respond to appellees' allegations but even from checking their files for information relevant to the charges made. Such restrictions certainly impaired their ability to prepare their case. We conclude, therefore, that the trial

was tainted by the overly broad order and that, consequently, the verdict must be vacated.

## II. The Absence of a Respondeat Superior Instruction

It is now established that local governing bodies may not be held liable, solely on the basis of a *respondeat superior* theory, for constitutional torts committed by their employees.[12] Some of the testimony presented at trial and a portion of appellees' counsel's closing argument might have been interpreted by the jury as implying that the District of Columbia was legally responsible for the consequences of unauthorized actions of individual prison guards.[13] The trial judge did not give the jury an instruction foreclosing such an interpretation. That omission was error.

## III. The Instruction on the Intermingling of Inmates

In the course of her instructions regarding whether the level of violence at Maximum violated the Eighth Amendment, the trial judge told the jury that they might consider the adequacy of the prison's system for classifying and segregating prisoners and, more specifically, the fact that "inmates who have participated in or have the potential for committing violence are placed in separate tiers of the same cellblock with prisoners who have been attacked or are particularly vulnerable to attack." App. 140. This instruction was factually accurate but somewhat misleading, insofar as it implied that the proximity of the two groups endangered the weaker prisoners, while the evidence supporting that inference was meager.[14]

---

10. *See* Affidavit of Jeffrey Jackson, ¶ 10, App. 173; Affidavit of Deborah Jones, ¶ 12, App. 178.

11. *See* note 3 *supra.*

12. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (suit brought under 42 U.S.C. § 1983 (Supp. IV 1980)); *Tarpley v. Greene,* 684 F.2d 1, 9–11 (D.C.Cir.1982) (suit brought directly under the Constitution).

13. *See, e.g.,* Transcript ("Tr.") 747, 749, 751–52, 757–58, 760, 761 (elicitation of admissions of "procedural violations" by guards); Tr. 1143 (counsel's ambiguous argument concerning the legal significance of such violations).

14. Indeed, appellees never disputed evidence presented at trial by appellants indicating that the gates between the two tiers were never opened. Tr. 633.

The prejudice suffered by appellants as a result of either this or the foregoing mistake on the part of the trial judge does not appear to have been substantial. Were these the only flaws in the proceedings below, we might be inclined to discount them as harmless error. But, because we have concluded that the abuse of discretion in issuing the protective order dooms the verdict, we need not speculate regarding the actual impact of the flaws in the instructions relating to permissible theories of liability and the intermingling of prisoners. However, we of course expect that these mistakes will be avoided in the new trial.

## IV. DAMAGE AWARDS FOR THE IMPOSITION OF "CRUEL AND UNUSUAL PUNISHMENT"

█ The fourth and final defect in the proceedings below relates to a portion of the charge to the jury that reads as follows:

If your verdict is for the plaintiffs, you must then proceed to determine the amount of damages.

Damages or injury must be proved by the persons who seek to be compensated. Actual damages are imposed to compensate the plaintiffs for injuries they have actually sustained. You are not to award damages for any injuries the plaintiffs may have suffered unless plaintiffs establish by a preponderance of the evidence in the case that the injuries were proximately caused by the defendants' wrongful conduct.

. . . .

It is not necessary that actual physical injury be shown in order for plaintiffs to recover in this action. If you find that plaintiffs were caused to suffer discomfort, mental or emotional distress or any other actual damage, as a result of defendants' wrongful acts or omissions, they are entitled to recover damages to compensate them for those injuries.

If you find that defendant [sic] deprived plaintiffs of their constitutional rights, you may award plaintiffs damages for that deprivation. There is no precise formula for calculating these damages. Nevertheless, although the value of the plaintiffs' constitutional rights is difficult to assess, it must be considered. Thus, if you find that defendants violated plaintiffs' constitutional rights, you should arrive at a damage figure based upon consideration of equity, reason and pragmatism.

App. 145–47. This and other language in the trial judge's charge makes it reasonably clear that the jury was not to award anything more than nominal damages to the plaintiffs in the absence of a showing of some actual injury. But the instruction does seem to leave open another possibility: if the jury concluded the plaintiffs had suffered actual harm, they might award damages to compensate them for (i) their physical injuries; (ii) their mental distress; *and* (iii) the intrinsic value of their constitutional rights—evaluated "upon consideration of equity, reason and pragmatism."

The legal standards against which such a charge must be measured are not altogether clear. Upon examination of the relevant case law, however, we are compelled to conclude that the permission granted the jury to compensate appellees for the value of their violated rights constituted reversible error.

Analysis of the applicable doctrine must begin with the opinion in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The Supreme Court there held that

the basic purpose of a [42 U.S.C.] § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights . . . . Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect.

*Id.* at 254, 98 S.Ct. at 1047. The Court's opinion does include language suggesting that portions of its rulings are applicable only to damage awards for violations of procedural due process. *Id.* at 258–59, 264–65, 98 S.Ct. at 1049–1050, 1052–1053. But, fairly read, those comments relate only to the identification and measurement of the particular interests shielded by different

constitutional provisions. As the language quoted above indicates, the Court meant to extend the basic "compensation principle" to *all* constitutional rights, substantive as well as procedural. It is disingenuous to suggest otherwise.[15] It is equally apparent that the Court intended to require, not just that plaintiffs demonstrate actual injury before they secure more than a nominal recovery, but that damage awards be *limited* to sums necessary to compensate plaintiffs for actual harm.[16]

By its terms, *Carey* explicitly governs only suits brought under 42 U.S.C. § 1983. But it would be difficult to defend a refusal to extend the holding of the case to suits brought directly under the Constitution—so-called *Bivens* actions.[17] The bodies of law relating to the two forms of litigation have been assimilated in most other respects.[18] Although the Court in *Carey* justified its decision partly on the basis of the legislative history of section 1983,[19] which of course is not applicable to suits brought under the Constitution, other aspects of its rationale are equally pertinent to *Bivens* actions. Certainly the general assertion that constitutional rights protect particular interests and are to be valued solely by reference to those interests is transferrable to the *Bivens* context. And the problems associated with leaving juries free to guess at the "inherent value" of constitutional

rights are equally germane to the two kinds of suits.[20]

How, then, do these principles bear upon a suit challenging prison conditions on the basis of the Eighth Amendment? The Supreme Court instructs us that "the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question .... " *Carey v. Piphus*, 435 U.S. at 259, 98 S.Ct. at 1050. In applying that injunction to suits like the one at bar, we must remember that we are dealing with prisoners, who in most instances are persons who have been convicted of committing serious crimes. As the Supreme Court has observed in a different context:

> [W]e have held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison....
>
> But our cases also have insisted on a second proposition: simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."

**15.** For opinions seeking to explain away *Carey's* adoption of the compensation principle, see *Halperin v. Kissinger*, 606 F.2d 1192, 1207 nn. 100–01 (D.C.Cir.1979), *aff'd per curiam by an equally divided Court, in part, cert. dismissed, in part,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981); *Konczak v. Tyrrell*, 603 F.2d 13, 17 (7th Cir.1979) (alternative holding), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980).

**16.** Similar views are adopted in *Clappier v. Flynn*, 605 F.2d 519, 529 (10th Cir.1979); *Morrow v. Igleburger*, 584 F.2d 767, 769 (6th Cir. 1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979); *Atcherson v. Siebenmann*, 458 F.Supp. 526, 537 (S.D.Iowa 1978), *rev'd in part on other grounds and remanded,* 605 F.2d 1058 (8th Cir.1979).

**17.** The reference is to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Jurisdiction in such suits is predicated on 28 U.S.C. § 1331 (Supp. IV 1980).

**18.** *See, e.g., Butz v. Economou,* 438 U.S. 478, 498–504, 98 S.Ct. 2894, 2906–2909, 57 L.Ed.2d 895 (1978) (same "qualified immunity" rules); *Tarpley v. Greene,* 684 F.2d at 9–11 (same rules concerning theories of liability to which municipalities are exposed); *Paton v. LaPrade,* 524 F.2d 862, 871 (3d Cir.1975) (same standards for determining compensable injuries).

**19.** 435 U.S. at 255–57, 98 S.Ct. at 1047–1048.

**20.** *Cf.* Note, *Damage Awards for Constitutional Torts: A Reconsideration After Carey v. Piphus,* 93 Harv.L.Rev. 966 (1980), which argues vigorously for delimitation of the Carey principle but acknowledges that valuation of constitutional rights on any other basis would be difficult and that any judicial constraints on the measurement process would be, at best, problematic, *id.* at 988–90.

*Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) (citations omitted) (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1059, 92 L.Ed. 1356 (1948)).

With these admonitions in mind, it is fair to conclude that the interests of prisoners shielded by the ban on "cruel and unusual punishment" correspond reasonably closely to the interests protected by analogous common-law tort rules.[21] *See Carey v. Piphus,* 435 U.S. at 257–58, 98 S.Ct. at 1048–1049. Specifically, it would appear that prisoners may recover for the infringement of three interests: (i) bodily integrity; (ii) peace of mind;[22] and (iii) earning capacity.[23] In other words, plaintiffs are entitled to compensation for any physical injuries, pain and suffering, emotional distress,[24] and impairment of their prospects for future employment proximately caused by the defendants' unconstitutional conduct.

In considering these questions, it is well to keep in mind that the Supreme Court has often observed that constitutional tort actions—both of the section 1983 and of the *Bivens* variety—have an important deter-

rent function. *See Carlson v. Green,* 446 U.S. 14, 21, 24–25, 100 S.Ct. 1468, 1472, 1474–1475, 64 L.Ed.2d 15 (1980); *Butz v. Economou,* 438 U.S. 478, 505, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978).[25] While, as the Court has indicated, it is improper to award damages *merely* for the purpose of discouraging future constitutional violations by other governmental officials, protection of constitutional rights requires that compensation for actual injuries be adequate. As this court has said before:

[I]n cases involving constitutional rights, compensation "should not be approached in a niggardly spirit. It is in the public interest that there be a reasonably spacious approach to a fair compensatory award for denial or curtailment of the right * * *." Specifying such damages will always be difficult, but they must be at least "an amount which will assure [the plaintiff] that [personal] rights are not lightly to be disregarded and that they can be truly vindicated in the courts."

*Halperin v. Kissinger,* 606 F.2d 1192, 1208 (D.C.Cir.1979) (footnotes omitted) (quoting *Tatum v. Morton,* 562 F.2d 1279, 1282 (opin-

**21.** Note that the analogies drawn are not limited to measures of recovery associated with the tort of false imprisonment but extend to damage theories relating to the more general categories of intentional and negligent harm. *Cf. Clappier v. Flynn,* 605 F.2d at 529 ("The interest protected by the common law of negligence ... parallels closely the interest protected by the Eighth Amendment .... ").

**22.** See RESTATEMENT (SECOND) OF TORTS §§ 46, 905(b) (1977).

In *Carey,* the Supreme Court went out of its way to sanction the award of compensation for emotional harm—on the condition that the plaintiff provides evidence thereof. 435 U.S. at 263–64 & n. 20, 98 S.Ct. at 1052 & n. 20.

**23.** *See* RESTATEMENT (SECOND) OF TORTS § 906(b) (1977).

While it must be acknowledged that there is no constitutional right to rehabilitation, *Rhodes v. Chapman,* 452 U.S. 337, 348, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), it would seem equally clear that prisoners have a right not to be subjected to conditions (apart from the reasonable incidents of incarceration itself) that *reduce* their ability to earn a living and otherwise to conduct themselves in the world following their release.

**24.** It may well be possible, in an appropriate case, to infer the infliction of emotional distress from the circumstances of the violation. *See Seaton v. Sky Realty Co.,* 491 F.2d 634, 637–38 (7th Cir.1974). While the Court in *Carey* seemed to frown on such a mode of proof in the context of procedural due process, 435 U.S. at 263–64 & n. 20, 98 S.Ct. at 1052 & n. 20, such inferences likely would be much more reliable when the plaintiff has been subjected to "cruel and unusual punishment."

**25.** *See also* Note, *Damage Awards for Constitutional Torts, supra* note 20, at 980–81. The obstacles faced by a victim of unconstitutional conduct to securing judgment in his favor, as well as structural problems in the impact of such decisions, may well make damage awards a less than ideal device for deterring future violations. *See* Whitman, *Constitutional Torts,* 79 MICH.L.REV. 5, 48–52 (1980). But the suggestion that, for deterrent purposes, we abandon damage awards entirely in favor of equitable relief, *id.,* ignores the utility of discouraging officials other than those involved in the case at bar from engaging in unconstitutional behavior.

ion for the court), 1287 (Wilkey, J., concurring) (D.C.Cir.1977)), *aff'd per curiam by an equally divided Court, in part, cert. dismissed, in part,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981).

Unfortunately, the jury in the instant action was permitted to award more than liberal compensation for actual harm. They were also instructed to determine—and to award damages for—the intrinsic value of the plaintiffs' Eighth Amendment rights. The likelihood that they obeyed that instruction is sufficiently great to necessitate a new trial.

### V. CONCLUSION

For the foregoing reasons, the judgment is reversed and the awards of damages and equitable relief are vacated.[26] The case is remanded for a new trial in accordance with this opinion.

Separate statements will be filed by Circuit Judge MacKINNON and Circuit Judge HARRY T. EDWARDS sometime shortly after the issuance of the foregoing opinion for the court.

---

**26.** The District Court, on remand, will of course be free to consider the propriety of granting equitable relief pursuant to FED.R.CIV.P. 65, pending the outcome of the new trial, that incorporates the terms of the original equitable decree.